Date signed December 21, 2006



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| WILBERT H. FREELAND, Sr. and CHRISTINE E. FREELAND, | * | Case No. 05-36349-JS |
| | * | Chapter 7 |
| Debtors | | |
| | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

| | | |
|---|---|---|
| TARYN DRUMMOND, INDIVIDUALLY and as PERSONAL REPRESENTATIVE OF THE ESTATE OF BEATRICE M. DRUMMOND, DECEASED, | * | |
| | * | |
| Plaintiff | * | Adv. Pro. No. 05-9134-JS |
| v. | * | |
| WILBERT H. FREELAND, SR., and CHRISTINE E. FREELAND, | * | |
| | * | |
| Defendants | * | |
| | * | |

*   *   *   *   *   *   *   *   *   *   *   *   *

***MEMORANDUM OPINION DETERMINING DEBT TO BE
NONDISCHARGEABLE AND ASSESSING PUNITIVE DAMAGES***

This opinion stands for the following propositions: (1) that certain debts that arose as a result of undue influence are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), where the plaintiff proves by a preponderance of evidence that undue influence was exerted fraudulently; and (2) that in an adversary proceeding brought in the bankruptcy court to determine a debt to be nondischargeable, where no prior judgment has been awarded in a nonbankruptcy forum, the bankruptcy court may liquidate the damages, enter a nondischargeable judgment, and may also, where appropriate, award punitive damages as part of the nondischargeable judgment, where the plaintiff also proves actual malice in the commission of fraud by clear and convincing evidence. For the reasons stated, the instant complaint will be granted and a nondischargeable judgment in the amount of $200,000, will be entered jointly against both defendants, and the Court will enter an additional nondischargeable judgment for punitive damages against one of the defendants in the amount of $500,000.

## FINDINGS OF FACT

In May 2001, Mrs. Beatrice Marion Drummond ("Mrs. Drummond"), an 86 year-old retired nurse and widow, was admitted to the psychiatric unit at Bon Secours Hospital in Baltimore, Maryland, where she was diagnosed with Alzheimer's disease,

dementia, delusional thoughts and paranoia. A final diagnosis at her discharge from the hospital indicated that she was manic depressive and psychotic. On May 24, 2001, the date of discharge, an After Care Plan (the "Plan") was prepared for Mrs. Drummond by a team comprised of a social worker, an occupational therapist and a registered nurse acting under the supervision of a physician. Plaintiff's Exhibit No. 6.

The Plan of treatment for Mrs. Drummond began while she was in the hospital and included "medication, group therapy, individual daily assessment by psychiatrist, therapeutic program and primary nursing," and provided for a follow-up appointment for her on Friday, June 8, 2001, at a psychiatric facility at Bon Secours Hospital known as "Brighter Vision," which Mrs. Drummond agreed to attend.

Because Mrs. Drummond was "unable to perform activities of daily living and was paranoid and suspicious," the Plan indicated that it was "appropriate to place [her] in SNF [senior nursing facility] secondary to safety concerns and diminished cognition." Plan, ¶ B1. Accordingly, the Plan provided that Mrs. Drummond be referred to an agency known as "Water Towers," a high-rise senior residential facility located at 1400 East Madison Street, in Baltimore City, the director of which was the defendant, Christine Freeland ("Mrs. Freeland"). The Plan disclosed that Mrs.

3

Drummond received a $2300 a month pension from Social Security and that she was a Medicare patient.  Plan, ¶¶ B3 and 4, Plaintiff's Exhibit No. 6.

On the same day, May 24, 2001, Mrs. Freeland interviewed Mrs. Drummond at the hospital, in the presence of Delores Claybourne,  ("Mrs. Claybourne"), Mrs. Drummond's goddaughter.  Until that date, Mrs. Drummond had never met Mrs. Freeland.  In addition to her employment at Water Towers, Mrs. Freeland owned and operated an unlicensed assisted living facility for the elderly known as "Angel's Paradise," then located in Baltimore County, Maryland, at 3514 Old Mill Road.  Her husband, Wilbert H. Freeland, Sr., was employed at the facility.  Mrs. Freeland represented to Mrs. Drummond and Mrs. Claybourne that Angel's Paradise was a licensed facility for elder care and told Mrs. Drummond that she would provide all care and services to Mrs. Drummond without expecting to be compensated.  As a result, Mrs. Drummond agreed to go with Mrs. Freeland and was released to her care.

Mrs. Drummond was the owner of a residence located at 4610 Springdale Avenue, in the city of Baltimore, and several bank accounts of which her granddaughter, the plaintiff, Taryn Drummond, was either the joint owner or the death beneficiary.  The funds in the accounts included proceeds of life insurance policies Mrs. Drummond received after the death of her only son, the plaintiff's father, who was murdered in 1996.

4

From May 24, 2001, until Mrs. Drummond died on October 20, 2001, a period of 149 days, the Freelands prevented Taryn Drummond and others from visiting or otherwise communicating with Mrs. Drummond.[1]  The Court finds from all of the evidence that during that time, that Mrs. Freeland "poisoned the mind" of Mrs. Drummond against the plaintiff by misrepresenting to her that her granddaughter had not called or attempted to visit Mrs. Drummond, which was false.

At trial, Taryn Drummond, the plaintiff, testified to having had a close and loving relationship with her grandmother, Mrs. Drummond, and that she was the joint owner or death beneficiary on her grandmother's accounts at First Union Bank from 1996 until Mrs. Freeland had the accounts altered two weeks before Mrs. Drummond's death.  The plaintiff last saw Mrs. Drummond alive shortly before she was taken to St. Agnes Hospital by Mrs. Claybourne.  After a week, Mrs. Drummond was transferred to the psychiatric unit at Bon Secours Hospital.  The plaintiff testified that she learned from Mrs. Claybourne that Mrs. Drummond was at Bon Secours, but when the plaintiff went to the hospital to visit her, she discovered that Mrs. Drummond had been discharged after only two days into the care of Mrs. Freeland.

---

[1]Mrs. Freeland testified that Mrs. Drummond did not wish to see her granddaughter, the plaintiff, or any of her other friends.  Contradicting Mrs. Freeland's testimony, the plaintiff testified that on the numerous occasions when she telephoned or came to visit Mrs. Drummond, Mrs. Freeland told her that Mrs. Drummond was too ill to come to the phone or to see her.

She found out from officials at Bon Secours that Mrs. Freeland operated a nursing facility at 3514 Old Mill Road. The plaintiff went to the address and when she could not communicate with a non-English-speaking attendant, she called the police, who advised her to contact the Maryland Department of Health and Mental Hygiene. She did so and discovered that Mrs. Freeland was not licensed by the State to manage a care facility for the elderly. She then returned to Bon Secours to find out how her grandmother could have been released into the care of someone without a license. When she confronted Mrs. Freeland at the 3514 Old Mill Road location, the plaintiff told her, "I've been looking for you and my grandmother." She was not permitted to see Mrs. Drummond.

After two months, Mrs. Freeland called the plaintiff to advise her that the telephone number at Angel's Paradise had been changed. The plaintiff testified that she did not realize that Mr. and Mrs. Freeland had taken Mrs. Drummond into their home at 7752 Glen Avenue in Pasadena, Anne Arundel County, Maryland, and that she did not know where her grandmother was or where the Freelands lived. On October 20, 2001, Mrs. Freeland called the plaintiff from North Arundel Hospital to tell her that Mrs. Drummond had died that day, the same day she was brought there. The death certificate listed the cause of Mrs. Drummond's death as "ventricular tachycardia," "Congestive heart failure" and "Sepsis," and it identified Mrs. Freeland

6

as the "informant" and the decedent's "foster daughter." The death certificate indicated that no autopsy was performed. The only time Taryn Drummond saw her grandmother from before her admission to Bon Secours and during her confinement by the debtors, was after Mrs. Drummond's death.

At trial, the plaintiff presented a 14-page report prepared by Mrs. Freeland and/or employees under her supervision, identified as "Care Notes," that purported to record Mrs. Drummond's statements, activities and treatment during her stay at Angel's Paradise, between the dates May 24 through September 3, 2001.[2]

---

[2]The full text of the document is set forth below:

Care Notes

5/24/01

On the above date at approximately 2 p.m. I went to pick up Beatrice Drummond from Bon Secour [sic] hospital. Skin was clean and intact, mental status good and alert. Need assistance with ADL and can ambulate with assistance. Asked Miss Drummond if she would like me to contact any relatives or Miss Delores Clayborne who I spoke with at the hospital who identifies herself as her god-daughter. Miss Drummond informed me that she has one granddaughter by the name of Taryn and she claimed it is not necessary for me to contact either of them because she do [sic] not wish for me to discuss anything with either of them because she takes care of herself and her own affairs. She also advised me that if I ever discuss her affairs with either of them she will leave and no-one [sic] will be able to find her because she needs a piece [sic] of mind.

Miss Drummond and I proceeded onto 3514 Old Mill Rd. I made her comfortable and went to fill her prescription while she was being

7

monitored by employees.

Christine Freeland

5/25/01

Miss Drummond appeared to be settling comfortable [sic] in her new soroundings [sic] and seemed to be happy.  She is very talkative today and even gave me Delores Clayborne['s] phone number [so] that I can call her to pick [up] her personal belongings.  I did reach Delores by telephone and I went to pick up Miss Drummond's house dresses, panties, bras and personal items, and her television.  She also expresses her feelings about the staff and how happy she is that she found someone that is actually taking care of her.

Christine Freeland

5/26/01

Miss Drummond started settling in her new home and adjusting to the surroundings physically and mentally.  She had her meal which she enjoyed, she appeared to be happy and contented until when Delores Clayborne called to speak to Miss Drummond she because very upset and refused to speak to her – claiming that she did not feel like talking to anyone.

It was about 6:15 p.m. Miss Drummond had a light supper, went to the bathroom and went to bed.

Sign.  Monica Ffrench.

5/28/01

Miss Drummond was happy, giving her little jokes as usual until she received a telephone call from her granddaughter, of which she said her granddaughter was asking her about her monthly checks money and wanted to move in her house.

Miss Drummond['s] statement to me was – I do not want to see her and don't [sic] want to see nor have anything to do with her nor Delores Clayborne because they never wanted to take care of me while [illegible] why I end up in the [illegible].

5/29/01

Miss Drummond was very happy to see me today.  She also

8

requested me to take her home. However, before we leave [sic] she asked me for the phone book, she said she wanted to locate a locksmith because she wants all her locks changed. I found one in the yellow pages for her and she spoke with him on the phone and make arrangements for him to meet her at her house. I took her to her house and she spoke with the next door neighbor and explained to the locksmith what she wants to be done. Miss Drummond transacted business with the locksmith and I took her back to the facility. She was very happy about what she had accomplished. She commented to me that now she is more comfortable because now Delores cannot get into her house. She also called Delores and tell her that she can now leave her alone because she cannot get into her house anymore because she changed her locks.

6/01/01

Miss Drummond is her usual self today happy and sociable. Miss Drummond commented on the menu today. We were having her favorite meal. She expresses that this month is her birth month and she was looking forward to her birthday cake and her favorite vanilla ice cream. Her best friend Vergie called and spoke with her for a while. She had a good day and retired to bed in good spirit [sic].

Sign [sic] Monica Ffrench

6/08/01

Miss Drummond had a psychiatrist appointment today, but she refused. She claimed that she dosent [sic] need to see any psychiatrist because she is fine.

6/15/01

Miss Drummond woke up in good spirit [sic] today very excited because today is her birthday. She was excited about her birthday cards that she received. She spoke with her granddaughter and Delores today briefly. They asked to come see her and she refused. She was awaiting Mrs. Freeland to come and have ice cream and cake with her. Mrs. Freeland came about 6 p.m. had ice cream and cake together, talked for a while and then she retired to bed in good spirit [sic].

9

6/20/01

Dr. Woreta came to see Miss Drummond today to see how Miss Drummond is doing he also did her assessment spoke with her for awhile. She explained she was not sleeping well. He then prescribed her some banadryl [sic].

6/22/01

Miss Drummond is in good spirit [sic] skin clean and glowing. She is sleeping a little better since [she] has been prescribed the banadryl. She is very happy today because she claimed she is getting to sleep better through the night now.

C. Freeland

6/29/01

Today, Miss Drummond seemed to be a bit confused. She questioned how long she has been here. She doesn't seemed [sic] to remember how long she has been here. She also mention[ed] about her husband and her son who [sic] she said had died. We try to make her comfortable however, it took her a while to fall asleep. Miss Drummond had a bowel movement in her sleep which made her very upset again. She became calm after she was cleaned up and we assured her that these things do happen and that is what we are here for. She then relaxed and went back to sleep.

Christine Freeland

7/1/01

This morning Miss Drummond woke up had breakfast and started giving jokes about she [sic] and Vergie. She was quite jovial through out the day, ate all her meals well. In the evening after going to the bath room I having helped her with her bath she [went] back to her room. She looked dazed and not responding. 911 was called in and she [illegible].
 Freeland and informed her of what happen[ed] and she met Miss Drummond at the hospital.

Sign [sic] Monica Ffrench

7/2/01

Miss Drummond is admitted to Northwest hospital they could not

10

find anything really wrong and therefore they ran various lab test[s] and released her the next day.  I asked if she wish[ed] for me to call anyone and she said no.

Christine Freeland

7/3/01

Miss Drummond called for me to pick her up from the hospital today.  I picked her up and took her back to the facility.  She was not given any medication and advised to continue with present care.

C. Freeland

7/19/01

Miss Drummond started complaining of frequent urination and pain in the uterus.  I informed Mrs. Freeland who told me that she would get in touch with the doctor.  She had very little appetite today but I encouraged her to drink a lot of fluids which she did.  Miss Drummond retired to bed earlier than usual because she was not feeling well.

Sign [sic] Monica Ffrench

7/20/01

Today, Dr. Woreta came to visit Miss Drummond due to the pain in her lower abdomen.  He gave a physical examination and indicated that she may have a urinary trac [sic] infection he therefore, prescribed some bactrim and to inform him if the pain continued or if there is [sic] any other changes in her behavior or if the pain doesn't go away in a couple days.  He also encourages for her a [sic] drink plenty of water.

8/01/01

Today, Mrs. Drummond claimed the pain is almost gone.  However, she is still not sleeping well.  We discussed the resident agreement but, she claimed she doesn't see the necessity in signing one because I promised to take care of her as long as she is alive.  Miss Drummond is very alert today and quite jovial.  Skin is clean and intact, eating well, walking good with assistance.  She also mentioned that she

11

needs to go home [so] that she can take care of her bills.

C. Freeland

8/3/01

On above date Miss Drummond received a phone call from her granddaughter.  Miss Drummond was very upset, appetite not good today, and cannot sleep. She was very upset about the call for every time she calls [it] is about money and wanted to know if she should move into her house to take care of her.  Miss Drummond claimed she told her she does not need any help.

Sign [sic] Monica Ffrench

8/4/01

Miss Drummond['s] granddaughter came to visit her today.  She identified herself as Taryn Drummond.  I informed her to hold on let me find out if [sic] Miss Drummond if it is ok.  Miss Drummond got very upset and refused to see her.  Miss Drummond said "who gave her the audicity [sic] to come and visit her without her permission."  Miss Drummond advised that it was very important that she see Mrs. Freeland today, so I called Mrs. Freeland and told her of which she said ok, I will be there soon.

Sign [sic] Monica Ffrench

8/4/01

Miss Drummond was very agitated depressed and angry.  She told me that her granddaughter came to visit today without her permission and she refused to see her.  She advised me that I must inform my staff that she do not want anyone to visit her unless she give them specific instructions.  She also reminded me that she needs to take care of some personal business.

C. Freeland

8/6/01

Today, Miss Drummond was in high spirits.  I took her to the bank and had lunch at Kentucky.

12

The plaintiff stated that she discovered that she was no longer the beneficiary on her grandmother's bank accounts after Mrs. Drummond died.  She was alerted that something was amiss when she obtained the death certificate and discovered that Mrs. Freeland had designated herself as Mrs. Drummond's "foster daughter."  She then

---

C. Freeland

8/8/01
     Called Dr. Woreta to visit Miss Drummond because she is still complaining of not being able to sleep.  He prescribed Ambien and also checked on the swelling of her feet.  He advised to keep the foot elevated.

8/15/01
     The podiatrist Dr. Ade Adetunj came visit Mrs. Drummond today.  He clipped her toe nails, there was no swelling on the foot or legs.  Will see her within 6 months.

C. Freeland
8/23/01
     Miss Drummond started becoming depressed and insisted for me not to leave her alone.  She also requested for me to sleep in the next bed beside her, she also consistently wants to go home with me.

C. Freeland

9/3/01
     Miss Drummond is consistently being depressed and wants to go home with me.  She said she no longer wants to remain at Angel's Paradise.  I agreed to discharge and take [her] home and take care of her.

C. Freeland

Care Notes.  Plaintiff's Exhibit No. 22.

13

went to First Union Bank, where she spoke to the branch manager, Mrs. Brenda G. Towe ("Mrs. Towe"), who told her that Mrs. Drummond's accounts had been altered to make Mrs. Freeland the beneficiary.  She also learned later that Mrs. Freeland had filed a will for Mrs. Drummond in the Orphans Court for Anne Arundel County on October 21, 2001, one day after Mrs. Drummond's death.

The will, dated September 8, 2001, was prepared by Mrs. Freeland for Mrs. Drummond, and purported to appoint Christine Freeland as Mrs. Drummond's personal representative and sole beneficiary of all her property, including her former residence.

Mrs. Freeland also executed a general power of attorney from Mrs. Drummond to herself, dated August 22, 2001, upon which Mrs. Freeland signed Mrs. Drummond's name as *"Beatrice Drummond/Christine Freeland,"* at an address in Severn, Maryland.[3]  Plaintiff's Exhibit No. 2.  The power of attorney gave Mrs. Freeland total and complete authority to act on Mrs. Drummond's behalf to take control of all of her assets, including the authority to open and close bank accounts and take possession of any safe deposit boxes and their contents.  Power of Attorney, dated August 22, 2001,  ¶¶ 1-10.

------

[3]According to the power of attorney, the address in Severn, Maryland, where the power of attorney was executed was 7817 Manet Way.

14

On October 5, 2001, Mrs. Freeland took Mrs. Drummond, who was in a wheelchair, to the branch of First Union Bank where her accounts were deposited and had Mrs. Drummond remove Taryn Drummond's name from the accounts and substitute that of Mrs. Freeland as death beneficiary.  Using the power of attorney, Mrs. Freeland then withdrew $100,000 from one of the accounts and, according to her testimony, spent "every penny of it, like Ms. Drummond asked me to do."  Mrs. Freeland testified that she kept no record of how she and Mr. Freeland spent the money, although further testimony at trial indicated that some of the money was deposited in the Freelands' joint bank account and some proceeds were used to purchase a Mercedes automobile titled jointly in the Freelands' names.  Two weeks and one day later, on October 20, 2001, after having been in the exclusive care and custody of the Freelands, Mrs. Drummond died.

Mrs. Freeland stated that she developed a "close relationship" with Mrs. Drummond and "provided Ms. Drummond with love and affection during her final months."  Defendants' Pretrial Statement [P. 45].

On October 21, 2001, the day after Mrs. Drummond died, Mrs. Freeland opened a decedent's estate for Mrs. Drummond in the Orphans Court for Anne Arundel County, Maryland,  Estate No. 48922, and submitted her last will and testament for probate.  In a document that Mrs. Freeland filed in the Orphans Court entitled

15

"Information Report," she listed two joint bank accounts held in the name of Mrs.

Drummond and herself, and one account owned by Mrs. Drummond that was payable

on death to Mrs. Freeland:

| | |
|---|---:|
| First Union Bank<br>Checking account No. 1010051207375 | $ 3,666.00 |
| First Union Bank<br>Money Market Account No. 1010030373699 | 41,375.12 |
| First Union Platinum Reserve<br>P.O.D. | 100,947.77 |
| TOTAL | $ 145,988.89 |

Plaintiff's Exhibit No. 9.

There was also testimony regarding another bank account owned by Mrs.

Drummond that was located at Provident Bank which Mrs. Freeland took and for

which she failed to account.

Even though the parties attended Mrs. Drummond's funeral together, the

Freelands never told the plaintiff about any of the financial transactions from which

they benefitted at her expense.

On May 9, 2002, Taryn Drummond filed a caveat proceeding in the Orphan's

Court by which she contested the validity of the will that Christine Freeland had

executed and presented for probate.  On May 21. 2002,  after a full evidentiary

16

hearing, the Orphans Court issued a three-page opinion in which it declared invalid the will prepared by Christine Freeland as a product of undue influence. The Orphans Court removed Christine Freeland as personal representative and appointed Taryn Drummond in her stead. Letters of Administration dated March 18, 2003 [Plaintiff's Exhibit No. 8.]

In its opinion, the Orphans Court stated: ". . . [T]he Court finds that the Last Will and Testament of Beatrice Drummond was procured at a time when she was highly susceptible to undue influence and at a time when she was not clear of mind and memory to understand the contents of her Will." Opinion of May 21, 2002, page 2. Plaintiff's Exhibit No. 15.

In support of its conclusion that Mrs. Drummond was not of sound mind when the will was executed, the Orphans Court made the following specific factual findings:

> It is clear that Mrs. Drummond did know Christine Freeland as she was in Mrs. Freeland's care. It is not clear if she knew and understood that Mrs. Freeland was the sole object of her bounty. Evidence presented to the Court shows that Beatrice Drummond was assessed as suffering from senile dementia, most likely Alzheimer's and she suffered from Major Depression, recurrent with Psychotic Symptoms, four (4) months prior to the signing of her Will. Other evidence shows that prior to her release from the Bon Secours Hospital, Mrs. Drummond had improved significantly but was to be followed up for out patient psychiatric care at Brighter Visions at Bon Secours Hospital.

> Mrs. Drummond was then put in the care of Mrs. Freeland. There was no testimony that revealed Mrs. Drummond did have follow up

17

outpatient psychiatric care at Brighter Visions – Mrs. Freeland testified she did not know anything about Brighter Visions.

*Id.*, p. 1.  The Orphans Court made the following factual findings in reaching the conclusion that Christine Freeland procured the will by employing undue influence over Mrs. Drummond:

> The court must also set a standard to undue influence.  The Court of Appeals, (*Anderson v. Meadowcroft*, 339 Md. 218 (1995)), identified the following elements that may be characteristic of it:
>
> 1.  The benefactor and beneficiary are involved in a relationship of confidence and trust;
>
> 2.  The will contains substantial benefit to the beneficiary;
>
> 3.  The beneficiary caused or assisted in effected execution of the Will;
>
> 4. There was an opportunity to exert influence;
>
> 5.  The will contains an unnatural disposition;
>
> 6.  The bequests constitute a change from a former will; and
>
> 7.  The testator was highly susceptible to the undue influence.
>
> (1) In this case the benefactor Beatrice Drummond was involved in a relationship of trust with Mrs. Freeland.  Care notes indicate that Mrs. Drummond was happy that she found someone [who] would take care of her.
>
> (2) The only beneficiary to Mrs. Drummond's estate was Mrs. Freeland.

18

(3) Testimony revealed the document containing the Last Will and Testament of Mrs. Drummond was prepared by Mrs. Freeland. The signing of the document took place in Mrs. Freeland's home and witnessed by persons known only to Mrs. Freeland.

(4) From the time Mrs. Drummond left the hospital at the end of May, her care was monitored by Mrs. Freeland. First at Angels Paradise, a home run by Mrs. Freeland and then Mrs. Drummond moved into Mrs. Freeland's private residence. On August 23, Care Notes from Angels Paradise reveal that Mrs. Drummond became very depressed and insisted that Mrs. Freeland not leave her alone. She requested Mrs. Freeland sleep in the next bed. Mrs. Drummond was very dependent on Mrs. Freeland for her living arrangements, medical care and her access to doctors, banking and other personal needs for which Mrs. Freeland received payment.

(5) Bequests have been made to many people who are not related to the benefactors. This is not unusual. What appears unnatural is that there was no mention of the decedent's only family, her granddaughter and grandson or her goddaughter. Not even a personal item was bequeathed to them.

(6) In this situation there was no change from a former will. In her eighty-six years Mrs. Drummond had never drawn a will. She had only jointly-held bank accounts.

(7) Because of Mrs. Drummond's health issues, and her dependency on Mrs. Freeland for her total care, health and social interaction, Mrs. Drummond was a prime candidate for being highly vulnerable to influence of one in her confidence and trust.

*Id.*, p. 2. As a consequence of invalidating the will, the Orphans Court ordered that

Mrs. Drummond's estate be administered under the laws of intestacy, by which

possession of 4610 Springdale Road was given to Taryn Drummond, as sole heir. The

19

opinion of the Orphans Court did not affect the *inter vivos* transfers of the bank accounts.

On May 13, 2004, the plaintiff filed a six-count complaint in the Circuit Court for Baltimore City against the Freelands and three others[4] to recover damages for breach of constructive trust, breach of fiduciary duty, conversion, unjust enrichment, and civil conspiracy, based upon fraud, for which compensatory damages were sought in the amount of $500,000, and punitive damages in the amount of $2,000,000.

The defendants failed to file an answer and an order of default was entered in January 2005. On March 29, 2005, the default was vacated upon motion of the Freelands, who were allowed until April 19, 2005, to file an answer. When they did not file an answer until July 2005, the plaintiff filed a motion to strike the answer on the ground of lateness. The Circuit Court [Berger, J.] held a hearing on the motion and determined that there was no justification for the late-filed answer and struck the answer, reentered the order of default against the Freelands and provided that a hearing would be scheduled "for an inquisition on the damages alleged in this case." Order of August 10, 2005 [Plaintiff's Exhibit No. 5].

---

[4]Constance Walls, the notary public who notarized the forged power of attorney, and Denise J. Tillman and Robert Royster, employees of the Freelands, who purportedly witnessed the execution of the will by Mrs. Drummond.

20

Before a hearing on damages could be scheduled, the Freelands took two actions: they filed an appeal to the Maryland Court of Special Appeals, which was dismissed on December 21, 2005, for their failure to complete and file a civil appeal information sheet; and on October 12, 2005, they filed the instant joint Chapter 7 bankruptcy petition in this Court.[5]

At the first of two meetings of creditors in the bankruptcy case, held on November 14, 2005, Mrs. Freeland gave the following testimony:

> Mrs. Freeland:  Miss Drummond when she was alive, I was in Baltimore County, I was working for – when I was running the business, I was still working at Water Towers, I was just starting out, and one day she just sent me one of the providers to call me, and said, I must make sure that I am coming the next morning because at the time I didn't know anything much about Miss Drummond at all.  When I got her from the hospital and I was taking care of her, there was no money to pay me, because you know, she did not mention what her income was and that was it.  And I just took her from the hospital to take care of her.  And I got called by her one morning because I used to go up in the evenings and spend time with her and she said she wanted to see me tomorrow. And she had the provider working at the time to call me.  And she asked me, one of the first questions she asked me was, "How long I been

---

[5]On their Schedule F, the Freelands listed Taryn Drummond as an unsecured creditor holding a non-priority, unsecured claim in the amount of $100,000 against Mrs. Freeland individually, despite the fact that the lawsuit was filed against both defendants.  Mr. Freeland indicated in Schedule I that he was unemployed and received no regular income.  Mrs. Freeland indicated on the same Schedule that she was employed as an "owner/operator" and that she received monthly income of $14,184.  There is no mention in the schedules of the debtors' interest in a business known as Angel's Paradise, including any real or personal property owned by them under that trade name.  Petition and Schedules [Plaintiff's Exhibit No.1].

21

here?" And I told her and she said, "You know, a lot of providers came to visit me when I was in the hospital. And I said, "Yes." And she said, "You were the only person that never asked me where or how I was going to pay you." I said, "Miss Drummond, I don't worry about that right now. My worry was, you know, I met you, we have a connection and you wanted me to take care of you. I don't worry about the payment right now." So when she first came to me, you know, I used to take my money, my salary and buy her medication and stuff. I think she was with me approximately almost two months, three months, before she told me, she called me in the morning and she wants me to take her somewhere. And I said, "Where?" And she said, "To my house." Lo and behold I didn't know where the house was at that time. I had no clue and the records can show that. She took me down Liberty Road to her house on Spring – Spring-something. The lady that used to take care of her was Delores Claybourne. Delores Claybourne – she said had her committed to Maryland General. Because when I went to pick her up, Delores Claybourne was there and she told the social worker, "I don't want to go anywhere with her anymore. I don't want any part of her. I met this lady and this is who I am going home with and this is who I want to take care of me."

Question (By Mr. Goddard): Did there come a time when Ms. Drummond asked you to take her to the bank to change the accounts?

Mrs. Freeland: Yes, she literally, she told me to take her into the bank of First Union at the time and when she walked in the bank manager –

Question (By Mr. Goddard): And when did Ms. Drummond ask you to take her to the lawyer's office to do her will?

Mrs. Freeland: She asked me to call the attorney because she wanted to go there. And I said, "We call one," and that's what she did. She told me to call a locksmith for her. She went to the locksmith and she changed her locks herself and she signed it. So I just followed instructions.

Question (By Mr. Goddard):  How long did you know Ms. Drummond before she died?

Mrs. Freeland:  I knew Miss Drummond a couple of months before she died.

Question (By Mr. Goddard):  And during that time you developed a friendship and she gave you $145,000?

Mrs. Freeland:  Yes because, yes.

Question (By Mr. Goddard): Who is First Connection?

Mrs. Freeland: That's me.  It's a corporation incorporated in the State of Delaware, doing business as Angel's Paradise.

Testimony of Christine Freeland, November 14, 2005.

On December 7, 2005, Taryn Drummond filed the instant adversary proceeding on behalf of herself and the Estate of Beatrice Drummond against the Freelands to have the debt owed by the Freelands determined to be nondischargeable.  The parties filed cross motions for summary judgment which this Court heard on October 16, 2006, and denied by order [P. 41] entered on October 23, 2006.[6]

--------

[6]The Court denied the motions for summary judgment for several reasons. First, in finding the exertion of undue influence in the procurement of the will, the Orphans Court did not make a specific finding of fraud.  Second, because the issue of damages had not been decided by the Circuit Court before the debtors filed the bankruptcy case, the issue of damages remained to be decided and required the presentation of evidence.  Third, this Court was of the opinion that the *pro se* defendants should be given every opportunity to defend themselves against the serious charges of fraud and conspiracy contained in the complaint, and fourth, to allow them an opportunity to explain why the default entered against them in the Circuit Court

23

*CONCLUSIONS OF LAW*

This complaint to determine dischargeability of debt is a core proceeding over which the bankruptcy court has subject matter jurisdiction to enter final orders, pursuant to 18 U.S.C. § 157(b)(1) and (b)(2)(I),[7] and is governed by 11 U.S.C. §523(a)(2)(A),[8] pursuant to which a debt is not discharged in bankruptcy to the extent

────────────────

was not legally justified.  After a full trial on the merits, the instant opinion disposes of these issues, based upon a careful consideration of the evidence presented by both sides.

[7]Section 157(b)(1) and (b)(2)(I) provides, as follows:

### § 157. Procedures.

(b)(1) Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title.

(2) Core proceedings include, but are not limited to–

(I) determinations as to the dischargeability of particular debts[.]

28 U.S.C. § 157(b)(1) and (b)(2)(I).

[8]Section 523(a)(2)(A) provides, as follows:

### § 523. Exceptions to discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt–

24

that the debt was obtained by false pretenses, a false representation, or actual fraud,

other than a statement respecting the debtor's or an insider's financial condition.

The subject matter jurisdiction of a bankruptcy court to make a determination

of nondischargeability of debt arising from the debtors' alleged fraudulent conduct

involving a decedent's estate is not curtailed by the so-called "probate exception" to

federal jurisdiction.  *See Marshall v. Marshall*, ___ U.S. ___, 126 S.Ct. 1735, 1748,

164 L. Ed.2d 480 (2006).[9]  In the instant case, the decision of this Court will have no

———————————

         *         *         *         *

  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

  (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A).

  [9]In *Marshall*, the decedent's estate was subject to ongoing proceedings in a Texas State probate court at the time the decedent's wife filed the Chapter 11 bankruptcy petition.  The nondischargeability complaint that originated in the bankruptcy court was not based upon the debtor's fraud in procuring a will from her deceased husband.  Rather, it was an adversary proceeding brought by the decedent's son and heir who alleged that his defamation claim against the debtor was nondischargeable in bankruptcy.  She, in turn, filed counterclaims against him in which she alleged that he had tortiously interfered with her expectation of an *inter vivos* gift the decedent had promised to her.  While there are no Maryland cases that recognize an independent cause of action in tort for interference with an expected inheritance, the Maryland Court of Special Appeals in *Geduldig v. Posner*, 129 Md. App. 490, 743 A.2d 247 (1999), opined that such a tort might be cognizable given

impact upon the jurisdiction of the State probate court to administer the decedent's estate of Beatrice Drummond or to dispose of any of her property. Nothing this Court does will interfere in any way with the actions previously taken by the State probate court. The decision of this Court will not disturb that of the Orphans Court of Anne Arundel County, which invalidated the will drafted by Mrs. Freeland and which deposed her as Mrs. Drummond's personal representative. At the present time, there is no property of the decedent's estate within the jurisdiction of the probate court.

As the personal representative of the decedent's estate of Mrs. Drummond, the plaintiff has standing to bring the present suit in the bankruptcy court. Maryland Estates and Trusts Code § 7-401(y) (2006).

The question to be decided in the present context is whether the plaintiff's claims that arose as a result of undue influence exercised by the defendants over the decedent in obtaining her property are nondischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2)(A), as having been the product of false pretenses, a false representation, or actual fraud. This opinion answers the question in the affirmative.

---

certain special circumstances, "where the traditional remedy might be insufficient to correct the pecuniary loss." 129 Md.App. at 509, 743 A.2d at 257. While Maryland does not recognize a separate tort of breach of fiduciary relationship, *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), it does, however, recognize the separate causes of action for damages based upon fraud and civil conspiracy, which the plaintiffs have pled in the instant case.

In order to render these debts nondischargeable, the statute requires that the defendants obtained something of value, including "money, property, services, or an extension, renewal, or refinancing of credit" from the creditor by false pretenses, a false representation, or actual fraud. *Nunnery v. Rountree (In re Rountree)*, 330 B.R. 166, 171-2 (E.D. Va. 2004), *citing Cohen v. de la Cruz*, 523 U.S. 213, 118 S.Ct. 1212, 140 L. Ed.2d 341 (1998). *See also Gleason v. Thaw*, 236 U.S. 558, 35 S. Ct. 287, 59 L. Ed. 717 (1915). To satisfy Section 523(a)(2)(A), fraud must be proven by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed.2d 755 (1991). This, the Court finds, the plaintiff has done.

"To sustain an action under Section 523(a)(2)(A), the plaintiffs must prove the following five elements: (1) that the debtor made a representation; (2) that at the time the debtor knew the representation was false; (3) that the debtor made the representation with the intention and purpose of deceiving the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained loss and damage as the proximate result of the representation. *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 149 (Bankr. D. Md. 1999).

Undue influence is not a tort, but rather a common law doctrine used to avoid and recover *inter vivos* and testamentary transfers of property made by vulnerable donors and testators to persons who connived to obtain such property by various

27

wrongful means. "Undue influence which will avoid a will must be unlawful on account of the manner and motive of its exertion, and must be exerted to such a degree as to amount to force or coercion, so that free agency of the testator is destroyed." *Moore v. Smith*, 321 Md. 347, 353, 582 A.2d 1237, 1239 (1990) (*quoting Nalley v. Nalley*, 253 Md. 197, 202, 251 A.2d 849 (1969)). *See also, Leimbach v. Allen*, 976 F.2d 912 (4th Cir.1992) (factors relevant to determining whether undue influence exists include whether benefactor and beneficiary are involved in relationship with confidence and trusts, will contains substantial benefit to beneficiary; beneficiary caused or assisted in effecting execution of will; opportunity to exert influence existed; will contains unnatural disposition; bequests constitute change from former will; and testator was highly susceptible to undue influence*); Orwick v. Moldawer*, 150 Md.App. 528, 822 A.2d 506 (2003) (undue influence amounts to physical or moral coercion that forces a testator to follow another's judgment instead of his own); *Anderson v. Meadowcroft*, 339 Md. 218, 661 A.2d 726 (1995) (allegation that testator was highly susceptible to undue influence was required to state claim against attorney who drafted will and received bequest); *Slicer v. Griffith*, 27 Md.App. 502, 341 A.2d 838 (1975) (a testator who has sufficient strength and clearness of mind and memory to know in general, without prompting, the nature and extent of property of which he is about to dispose, nature of act which he is about to perform, names and identity of

persons who are to be object of his bounty, and his relations toward them, is legally competent to make a will); *Shearer v. Healy*, 247 Md. 11, 230 A.2d 101 (1967) (undue influence that will avoid a will must be unlawful on account of manner and motive of its exertion and must be exerted to such degree as to amount to force or coercion so that free agency of testator is destroyed); *Hughes v. Averza*, 223 Md. 12, 161 A.2d 671 (1960) (undue influence that invalidates a last will and testament is that degree of importunity which, because the testator is too weak to resist it, deprives testator of his free agency and subordinates his will to that of another); *Tufts v. Poore*, 219 Md. 1, 147 A.2d 717 (1959) (where questions of fraud or undue influence are involved in a will contest, any evidence, however slight, tending to prove the issues is admissible); *Sellers v. Qualls*, 206 Md. 58, 110 A.2d 73 (1954) (to warrant a finding of such undue influence as will invalidate a will, it must be shown that there existed that degree of importunity which deprives the testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act); *Koppal v. Soules*, 189 Md. 346, 56 A.2d 48 (1947)(undue influence which will avoid a will must be unlawful influence on account of manner and motive of its exertion, and must be exerted to such a degree to amount to force or coercion, destroying free agency, and there must be satisfactory proof that will was obtained by such coercion, or by importunities which could not be resisted, so that

motive was tantamount to force or fear); *Cook v. Hollyday*, 185 Md. 656, 45 A.2d 761 (1946) (where it is found that a person was so weak in body that she was a mere passive instrument in the hands of others, and the court can presume that the person through whose influence the transaction was made for his own benefit was conscious that he was obtaining an unjust disposition, the transaction cannot stand); *Woodruff v. Linthicum*, 158 Md. 603, 149 A. 454 (1930) (to set aside a will, it must affirmatively appear that undue influence was actually exercised and testator acted under another's control, which he was unable to resist).  With respect to the determination of undue influence as to *inter vivos* transfers, *see Walton v. Davy*, 86 Md.App. 275, 586 A.2d 760 (1991), *cert. denied*, 323 Md. 309, 593 A.2d 669 (1991) (for purposes of determining whether *inter vivos* transfer was result of undue influence, confidential relationship, which will place burden of establishing fairness of transaction upon its beneficiary, must be proven and will not be presumed merely because transaction occurred between elderly parent and his or her child; such finding depends on parent's advanced age, physical debility, mental feebleness and dependence on child); *Treffinger v. Sterling*, 269 Md. 356, 305 A.2d 829 (1973) (undue influence may arise from breach of confidential relationship existing between a grantor and his grantee); *Tracey v. Tracey*, 160 Md. 306, 153 A. 80 (1931) (deed was set aside on ground of undue influence where evidence showed that at the time

30

she executed the deed, the donor "was wholly dependent upon, and surrounded by persons who benefited by it at her expense and was inconsistent with the theory that the deed was the free, voluntary, and unbiased act of the grantor).

Therefore, it is not necessary to prove fraud in order to prove undue influence, although fraudulent conduct may often be present. *See, e.g., Bolan v. Bolan*, 611 So.2d 1051 (Ala. 1993) (fraud in the procurement of a will is generally considered a species of undue influence). In *Davis v. Calvert*, 5 G. & J. 269, 25 Am. Dec. 282 (1833), 1833 WL 2201, the earliest reported case in Maryland dealing with undue influence, the Court of Appeals (Buchanan, C.J.) stated:

> Fraud is a distinct head of objection from importunity and undue influence. Importunity and undue influence may be fraudulently exerted, but they are not inseparably connected with fraud: nor is it every degree of importunity that is sufficient to invalidate a will or testament. Honest and moderate intercession or pursuasion [sic], or flattery unaccompanied by fraud or deceit, and where the testator has not been threatened or put in fear by the flatterer or persuader, or his power or dominion over him, will not have that effect. But there may be great and overruling importunity and undue influence without fraud, which, when established, may and ought to have effect, (under circumstances) to avoid a will or testament. Such as the immoderate, persevering, and begging importunities and flattery of a wife who will take no denial, pressed upon an old and feeble man, which may be better imagined than described: or dominion obtained over the testator under the influence of fear, produced by threats, violence, or ill treatment. In neither of those instances, may there be any direct fraud; but an overruling influence upon the mind and feelings of a testator, according to the degree of his judgment and firmness.

To persuade or importune merely, is not to defraud, neither is it a fraud to threaten or ill treat, where there is no false impression, no deception practiced; but it is the moving cause of a pervading fear operating upon, and governing the will and actions of the person so put in fear, and controlling, and restraining the fair bias of his mind. Open violence is usually the opposite of fraudulent and deceitful practices; but not less destructive of the validity of a will or testament made under its influence. A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. . . .That degree therefore of importunity or undue influence, which deprives a testator of his free agency; which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it.

*Davis v. Calvert*, 5 G. & J. at 301-2, 1833 WL at 21-2 *(citations omitted)*.

Therefore. standing alone, a finding that a donee or beneficiary unduly influenced the making of a gift, devise or bequest does not necessarily rise to the level of fraud. *See* AMERICAN JURISPRUDENCE 2d, Wills § 395. FRAUD. Relationship to undue influence, 532 (2002 ed.); 1 PAGE ON THE LAW OF WILLS §§ 14.7, 14.8, 15.1, 15.2 (2003 ed.); THOMPSON ON THE LAW OF WILLS §§ 139-41 (3d ed. 1947).

The conduct of the Freelands in procuring Mrs. Drummond's will is relevant to the present inquiry as it relates to the circumstances of the transfers of the bank accounts. The determinations made by the Orphans Court that Mrs. Freeland obtained the will by undue influence, and that Mrs. Drummond did not possess the mental capacity necessary to make a will, are binding upon the parties and this Court, based upon the doctrine of collateral estoppel. Collateral estoppel, or issue preclusion,

occurs "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Murray Int'l Freight Corp. v. Graham*, 315 Md. 543, 547, 555 A.2d 502, 504 (1989), *quoting from* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). *See also, Gibson v. State*, 328 Md. 687, 693, 616 A.2d 877 (1992), to the effect that collateral estoppel operates to preclude the retrial in a later action of an issue of ultimate fact previously determined by a valid and final judgment.)

The determinations by the Orphans Court have mere evidentiary effect upon this Court's inquiry into the defendants' conduct relative to the bank accounts, matters not decided by the Orphans Court, because Mrs. Drummond's transfers of bank accounts "payable on death" to Mrs. Freeland are treated by Maryland statute as *inter vivos* transfers.[10] While it is true that the Orphans Court made no specific finding that

---

[10]Maryland Estates and Trusts Code § 1-401, provides as follows:

### § 1-401. Certain transfers considered nontestamentary.

A provision in an account agreement, as defined in § 1-204(b)(2) of the Financial Institutions Article, for a transfer on death is nontestamentary and shall be effective according to the provisions of § 1-204 of the Financial Institutions Article. Transfers pursuant to § 1-204 of the Financial Institutions Article are effective in the form and manner prescribed by that section and are not to be considered testamentary.

33

the defendants committed fraud in the procurement of Mrs. Drummond's will, the Supreme Court held in *Brown v. Felsen*, 442 U.S. 127, 129-130, 136, 99 S.Ct. 2205, 2208-2209, 2211, 60 L. Ed.2d 767 (1979), that the bankruptcy court may inquire beyond the facts found by the State court in order to determine whether a debt is nondischargeable in bankruptcy as having been based upon fraud.  *See also, Archer v. Warner*, 538 U.S. 314, 319, 123 S.Ct. 1462, 1466, 155 L. Ed.2d 454, 460-1 (2003) (debt that arose from a settlement in a suit based upon fraud "can also amount to a debt for money obtained by fraud, within the terms of the nondischargeability statute.").  If the actions of Mrs. Freeland in procuring the will were fraudulent and were part of a scheme in which her husband conspired to deprive the plaintiff out of her rightful ownership of the bank accounts, the resulting debt is rendered nondischargeable, pursuant to Section 523(a)(2)(A).

The parties and this Court are already bound by the determination made by the Circuit Court for Baltimore City, that the Freelands are liable to the plaintiff for fraud, conspiracy and unjust enrichment.  Even though the determination of liability was based upon the defendants' default, and not after a trial, the defendants were afforded a full and complete opportunity to timely plead their defenses, which they failed to do.

---

*Id*., *quoted in Hartlove v. Maryland School for the Blind*, 111 Md.App. 310, 681 A.2d 584 (1996), *cert. granted*, 344 Md. 717, 690 A.2d 523, *vacated*, 344 Md. 720, 690 A.2d 526, *on remand*, 116 Md.App. 738, 116 Md.App. 742.

34

"[F]or *res judicata* purposes a default judgment is given the same [preclusive] effect as a judgment entered after a trial on the merits. *Sheahy v. Primus Automotive Financial Services, Inc.*, 284 F. Supp.2d 278, 281 (D. Md. 2003), *citing Orca Yachts, L.L.C. v. Mollicam, Inc.*, 287 F.3d 316, 319 (4th Cir.2002), *citing Morris v. Jones*, 329 U.S. 545, 550-51, 67 S. Ct. 451, 91 L. Ed. 488 (1947); 18 C.A. Wright, A.R. Miller & E. H. Cooper, FEDERAL PRACTICE & PROCEDURE § 4442 at 373 (1981); 18 MOORE'S FEDERAL PRACTICE § 131.30[3][d] at 131-106 (3d ed.1997).

In *Upman v. Clarke*, 359 Md. 32, 35, 753 A.2d 4, 5 (2000), the Court of Appeals of Maryland explained the differences in burdens of proof accorded to the parties to suits regarding *inter vivos* as opposed to testamentary transfers where undue influence is alleged:

> . . . [W]hen the challenged gift is an *inter vivos* one – a present gift made during the donor's lifetime – and the person attacking the gift establishes that a confidential relationship existed between the donor and the donee, there is a presumption against the validity of the gift, and the burden shifts to the donee to establish, by clear and convincing evidence, that there was no abuse of the confidence. When the gift is testamentary, however, taking effect upon the death of the donor, the existence of a confidential relationship between the donor and donee is simply one suspicious circumstance to be considered; it does not, of itself, give rise to a presumption of invalidity, and the burden remains with the person challenging the gift to prove a substantially overbearing undue influence.

*Id.* The Freelands have failed to sustain their burden of proof by clear and convincing evidence that the transfers of Mrs. Drummond's bank accounts and the proceeds

thereof were obtained by them in good faith.  By the same token, the plaintiff has proven that the conduct of both defendants in the execution of Mrs. Drummond's will and her power of attorney and their obtaining possession of the proceeds of her bank accounts were fraudulent.

For all practical purposes, from the start of her relationship with Mrs. Drummond, Mrs. Freeland intended to obtain possession and ownership of her assets fraudulently.  Evidence indicates that from May 24, 2001, the date of their first meeting, Mrs. Freeland became aware of the fact that Mrs. Drummond received a pension and was a Medicare patient.  Nevertheless, Mrs. Freeland represented to her that she need not worry about paying for her care while she was in Mrs. Freeland's nursing home.  Over the course of several months, Mrs. Freeland ingratiated herself with Mrs. Drummond, gained access to information regarding her assets, and took criminal action to forge her will and a power of attorney.  In her testimony and in her documentary evidence, Mrs. Freeland failed to give any reason for the timing and the urgency of Mrs. Drummond's visit to the Bank to change the beneficiaries on her accounts.  There was no independent evidence presented as to the reason for changing the accounts, other than the confidential relationship that Mrs. Freeland created between herself and Mrs. Drummond.  There was no evidence that Mrs. Freeland ever expected to be reimbursed by Medicare for Mrs. Drummond's care, despite the fact

36

that the After Care Plan clearly indicated that Mrs. Drummond was a Medicare patient. Likewise, there is no evidence of any bills presented by the Freelands to Mrs. Drummond for the nursing care she received from the defendants while she was a resident patient at their facilities. This indicates to the Court that the defendants expected to be reimbursed from a different source, namely by having Mrs. Drummond turn over her home and all of her other assets to them. Mrs. Freeland's actions in having Mrs. Drummond sign over her bank accounts to her were made upon actual fraud committed in isolating Mrs. Drummond from her granddaughter and friends, by misrepresenting to Mrs. Drummond the false charge that her granddaughter was not worthy of being her heir because of her abandonment of Mrs. Drummond, and by her forgery of Mrs. Drummond's will and power of attorney.

In light of the determination by the Orphans Court that (1) Mrs. Drummond was diagnosed with Alzheimer's disease and dementia at the time she was released from the hospital and placed in the care of Mts. Freeland on May 24, 2001, that a confidential relationship arose between Mrs. Drummond and Mrs. Freeland on account of Mrs. Drummond's condition and her dependence upon Mrs. Freeland, that Mrs. Drummond was not competent to make a will on September 8, 2001, that Mrs. Freeland had not taken Mrs. Drummond in June 2001 for follow-up treatment at Brighter Visions to alleviate her mental condition, and that shortly before her death

37

on October 20, 2001, Mrs. Drummond had further regressed mentally to a point where she exhibited childlike behavior when she demanded to sleep in the bed next to Mrs. Freeland in her residence, it is reasonable to infer, as this Court finds, that Mrs. Drummond was not of sound mind and in the full possession of her mental faculties when she was taken to the Bank by Mrs. Freeland on October 5, 2001.[11]

_____

[11]The opinion testimony of Mrs. Brenda G. Towe, branch manager of the First Union Bank on Liberty Heights Avenue, to the effect that Mrs. Drummond was able to understand the nature and consequences of her actions in changing the account beneficiaries will be accorded little weight, for the following reasons.

Mrs. Towe testified (1) that she had known Mrs. Drummond as a bank customer for four years prior to her visit to the Bank on October 5, 2001; (2) that she had not seen Mrs. Drummond for several months due to Mrs. Drummond's illness; (3) that Mrs. Drummond arrived at the Bank in a wheelchair, in company with Mrs. Freeland, whom Mrs. Towe testified she did not know, and whom Mrs. Drummond identified as her caretaker to whom she owed money for her care over a period of several months; (4) that Mrs. Towe became suspicious when Mrs. Drummond stated her intention of making Mrs. Freeland her beneficiary on certain accounts formerly titled in the name of Mrs. Drummond and her granddaughter, Taryn Drummond; (5) that Mrs. Towe knew Mrs. Drummond to be stubborn and strong-willed from past dealings with her; (6) that Mrs. Towe had a lengthy discussion with Mrs. Drummond out of the presence of Mrs. Freeland to satisfy herself that Mrs. Drummond's decision to change the bank accounts was free and voluntary; and (7) that Mrs. Drummond was unshakeable in her intention to make Mrs. Freeland her beneficiary.

The testimony of Mrs. Towe does nothing to dispel the Court's conviction that Mrs. Freeland perpetrated a fraud upon Mrs. Drummond to obtain possession of her funds. Her description of Mrs. Drummond's demeanor at the Bank is entirely consistent with that of one whose free will has been overpowered by undue influence and fraud. Having been convinced to take the improvident action of turning over complete control of her bank accounts, Mrs. Drummond presented an appearance to Mrs. Towe perfectly consistent with her normally strong-willed stubbornness.

The judgment of the Circuit Court for Baltimore City established the defendants' liability based upon their failure to answer the complaint that contained the following allegations, which are taken as undisputed and which the defendants are collaterally estopped from contesting:

(1)  Mr. Freeland was engaged in a conspiracy with Mrs. Freeland to defraud the plaintiff out of substantial money and property.

(2) Mr. Freeland received the proceeds of the fraud, including funds from the decedent's bank accounts.

In his papers filed in the instant bankruptcy case, Mr. Freeland acknowledged his joint liability with Mrs. Freeland to the plaintiff for a claim in the amount of $100,000, which is said to be based upon the funds misappropriated from Mrs. Drummond's bank accounts.  In his testimony at trial, when asked regarding his

---

The Court discounts the affidavit that the Freelands prepared and that Mrs. Towe signed to the effect that Mrs. Drummond's decision to place Mrs. Freeland's name on the accounts was voluntary.  It is undisputed that while Mrs. Towe was a bank manager, she was neither an expert in the field of psychiatry or of mental competence in others.

The Court finds that having been forcefully persuaded and deceived by Mrs. Freeland to change her bank accounts, Mrs. Drummond was convinced by the time she arrived at the Bank that making such a change was her own idea.  In either event, it is obvious that on the date of the decedent's visit to the Bank, Mrs. Towe was ignorant of the facts that Mrs. Freeland had forged Mrs. Drummond's will and her power of attorney, of the various ploys used by Mrs. Freeland to ingratiate herself with Mrs. Drummond and to disparage Mrs. Drummond's granddaughter in her eyes.

employment, he stated, "I work with my wife as caretaker of her business," although in his bankruptcy schedules he stated under oath that he was unemployed.  In opposing the plaintiff in the instant adversary proceeding, as well as in the prior litigation between the parties, Mr. Freeland has actively supported Mrs. Freeland in the perpetration of fraud, while sharing in the proceeds derived from it.  Testimony elicited from Mr. Freeland at the trial indicated that Mrs. Freeland used some of the money obtained from Mrs. Drummond's bank accounts to purchase a Mercedes automobile that she titled jointly in her name and that of Mr. Freeland.  Finally, after the Freelands got their hands on Mrs. Drummond's assets, Mr. Freeland conspired with Mrs. Freeland in keeping Mrs. Drummond *incommunicado* in their personal residence, where she died without ever being seen alive by her family and friends.

Where the Court is presented with conflicting evidence, it must exercise its discretion to determine which evidence is credible and which is not.  Having had the opportunity to observe the conduct of the defendants throughout this litigation, including their demeanor as witnesses at trial, and considering their evasive and unbelievable testimony as to their version of events; as *pro se* parties in their presentation of questions, baseless comments and oral argument; and finally, as debtors, the false and misleading information contained in their bankruptcy schedules,

this Court has no choice but to find that the defendants lack credibility and that their factual statements are unworthy of belief.

Likewise, the so-called "Care Notes" allegedly maintained in the ordinary course of business by Mrs. Freeland during Mrs. Drummond's residency with the defendants, that were turned over to the plaintiff in discovery to substantiate Mrs. Drummond's love for Mrs. Freeland and her disdain for Mrs. Drummond's family and friends, are unworthy of belief.  The Court finds that they contain self-serving statements that were obviously concocted by Mrs. Freeland and others under her supervision and control that are unsubstantiated by independent evidence of any kind. Although they were designated as "Care Notes," they contained virtually no information regarding the care given to Mrs. Drummond during her stay with the defendants, including the dates and times that medicine was administered to her.  Mrs. Freeland testified that a different log existed that detailed the dates that medicine was administered to Mrs. Drummond, but never submitted that document in evidence.  The Court infers from the failure by the defendants to produce the document either (1) that it does not exist or (2) that it does not support the testimony of Mrs. Freeland that medicine was properly administered to Mrs. Drummond while she was in the defendants' care.  In addition, there is substantial doubt that the "Care Notes" were prepared contemporaneously while Mrs. Drummond stayed with the defendants.  They

41

appear to have been prepared long after the fact, because they do not contain a daily summary of events on contiguous dates. Finally, they do not record certain pivotal events, most improbably the supposed visit of Mrs. Drummond to Severn, Maryland, to execute the general power of attorney, which that document indicates occurred on August 22, 2001, during the period supposedly covered by the Care Notes. Accordingly, the Court will treat the Care Notes as further evidence of the defendants' fraudulent scheme.

AMOUNT OF THE NONDISCHARGEABLE DEBT

When a complaint to determine nondischargeability of debt is brought in the bankruptcy court prior to the entry of a judgment in a nonbankruptcy forum, the bankruptcy court has subject matter jurisdiction, not only to determine nondischargeability of the debt, but also to liquidate the amount of the debt and enter a nondischargeable judgment therefor. This Court "may adjudicate issues of liability and damages in addition to determining dischargeability of debt where there was no prior state court judgment fixing liability." *Heckert v. Dotson (In re Heckert)*, 272 F.3d 253, 257 (4th Cir. 2001); *Snyder v. Devitt (In re Devitt)*, 126 B.R. 212, 215 (Bankr.D.Md.1991) ("If it is acknowledged as beyond question that a complaint to determine dischargeability of a debt is exclusively within the equitable jurisdiction of the bankruptcy court, then it must follow that the bankruptcy court may also render

42

a money judgment in an amount certain without the assistance of a jury. This is true not merely because equitable jurisdiction attaches to the entire cause of action but more importantly because it is impossible to separate the determination of dischargeability function from the function of fixing the amount of the non-dischargeable debt."), *quoted in Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017-18 (9th Cir. 1997).

"The objective of an award of compensatory damages is to make the plaintiff whole by monetary compensation." *Exxon Corp. v. Yarema*, 69 Md.App. 124, 137, 516 A.2d 990 (1986), *cert. denied*, 309 Md. 47, 522 A.2d 392 (1987). This Court has determined that the defendants are jointly liable to the plaintiff for a nondischargeable debt in the amount of $200,000, representing compensatory damages for the plaintiff's property that was obtained by the defendants through fraud, and represents the $145,988.89 that was misappropriated from Mrs. Drummond's bank accounts at First Union Bank on October 5, 2001, plus interest since the date of the misappropriation, plus the plaintiff's deprivation by the defendants of Mrs. Drummond's real property during the time that the plaintiff was engaged in contesting the will executed by Mrs. Freeland.

43

PUNITIVE DAMAGES

The award of punitive damages  "does not attempt to compensate the plaintiff for harm suffered by him, but rather is exemplary in nature and is over and above any award of compensatory damages." *Commissioner of Internal Revenue v. Miller*, 914 F.2d 586, 589 (4th Cir. 1990), *quoting Exxon Corp. v. Yarema*, 69 Md.App. 124, 137, 516 A.2d 990, 997 (1986), *cert. denied*, 309 Md. 47, 522 A.2d 392 (1987).  In order to justify the award of punitive damages in this case, as requested by the plaintiff, this Court must find the presence of actual malice in the conduct of the defendants, described by the Maryland Court of Appeals as "evil motive, intent to injure, ill will, or fraud." *Owens-Illinois v. Zenobia*, 325 Md. 420, 439, 601 A.2d 633, 642 (1992). The court also held that the burden of establishing actual malice is more than by a mere preponderance, but "by clear and convincing evidence." *Zenobia*, 325 Md. at 468, 601 A.2d at 657. *See also, Biktasheva v. Red Square Sports*, 366 F. Supp.2d 289 (D. Md. 2005) (actual malice characterized as performance of an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff); *Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787 (D. Md. 1998) ( person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the actual malice required for the availability of punitive

44

damages); and *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 652 A.2d 1117 (1995) (same).

It is obvious that between the two defendants, Mrs. Freeland was the most culpable as the leading force in the perpetration of the fraud in this case. She was the better educated of the two, and despite her advanced degree in ethics, the overwhelming evidence presented demonstrates that she was guilty of the following unethical and atrocious misconduct that was so malicious, shocking, evil, vile and reprehensible that it justifies the imposition of significant punitive damages against her individually:

(1) Mrs. Freeland isolated Mrs. Drummond from family members and friends and told Mrs. Drummond that they had abandoned her, in breach of her duty as a caregiver of the elderly to treat Mrs. Drummond with compassion.

(2) Mrs. Freeland denied Mrs. Drummond's family members and friends access to her, preventing them from socializing with her and from assessing her condition and from verifying that she was receiving proper care, in violation of her duty as a caregiver of an elderly and mentally-disabled person to communicate with her family members and friends.

(3) Mrs. Freeland denied medical treatment to Mrs. Drummond to alleviate her mental condition by not taking her to appointments, in violation of her duty to Mrs.

45

Drummond as a care giver to an elderly and mentally-disabled person who was in need of continuing medical supervision, as required by the AfterCare Plan prepared by Bon Secours Hospital. The Court finds that Mrs. Freeland lied in her testimony at trial when she stated that the reason she did not take Mrs. Drummond to her appointment at Brighter Visions was because Mrs. Drummond refused to go. This directly contradicted her testimony in the Orphans Court to the effect that she had never heard of Brighter Visions at the time Mrs. Drummond was in her care.

(4) Mrs. Freeland removed Mrs. Drummond, an aged, infirm, mentally deficient person from the nursing home to which the hospital released her without any notice to or authorization from family members or trained medical personnel, which this Court finds was ultimately detrimental to Mrs. Drummond's well-being.

(5) Mrs. Freeland forged Mrs. Drummond's signature on a will and a power of attorney, whereby Mrs. Freeland fraudulently made herself a fiduciary in fact of Mrs. Drummond. She then abused her fiduciary position as personal representative and attorney in fact by transferring Mrs. Drummond's property to herself for her own benefit and that of her husband, Mr. Freeland, thereby depriving the plaintiff of her rights as the natural object of Mrs. Drummond's bounty.

(6) Mrs. Freeland obtained possession of Mrs. Drummond's house by use of the forged and fraudulent will, which she and her husband only returned to Taryn

46

Drummond as personal representative of Mrs. Drummond's estate after the will was invalidated by the Orphans Court of Anne Arundel County, at great expense to Mrs. Drummond's estate and Ms. Taryn Drummond personally.

(7) Mrs. Freeland obtained possession of Mrs. Drummond's money in her bank accounts by having Mrs. Drummond make her the joint owner, in violation of her duty of trust to the disabled person and to her family and heirs.

(8) Mrs. Freeland dispossessed Mrs. Drummond's heirs by taking possession of Mrs. Drummond's house and money. She cheated Taryn Drummond, Mrs. Drummond's granddaughter, out of her rights to the money in Mrs. Drummond's bank accounts by having Mrs. Drummond remove Taryn Drummond as joint owner of the accounts.

(9) Mrs. Freeland made false and misleading statements to Mrs. Drummond's attending physician who completed the death certificate when she told him that she was Mrs. Drummond's "foster daughter."

(10) Mrs. Freeland's misrepresentation to the physician that she was Mrs. Drummond's "foster daughter" placed her in a false position as a member of the family to decline the performance of an autopsy on the body of Mrs. Drummond. This is highly relevant in light of the next finding.

47

(11)  This Court views as highly suspicious the death of Mrs. Drummond just days after she was stripped of all of her assets by Mr. and Mrs. Freeland, while they kept her *incommunicado* in a childlike state in their personal residence, outside of the nursing facility and in their exclusive custody and control, away from her family and friends, who were completely ignorant of her whereabouts until Mrs. Freeland advised them of her death.

(12)  After becoming Mrs. Drummond's fiduciary by fraud and deception, Mrs. Freeland misappropriated her funds, shared them with Mr. Freeland, and failed to account for their disposition or to remit them to Mrs. Drummond's rightful heirs.

Therefore, the Court will award nondischargeable, punitive damages in favor of the plaintiff and against the defendant, Christine Freeland, in the amount of $500,000, representing two-and-one half times the amount of the plaintiff's compensatory damages, an amount which this Court believes would have been awarded by the Circuit Court for Baltimore City, had that court reached the damages stage of the litigation.  "In determining the amount of punitive damages to award, the Court must consider the reprehensibility of the defendant's conduct and the harm inflicted on the plaintiff, *In re Exxon Valdez*, 270 F.3d 1215, 1240-41 (9th Cir.2001), as well as the defendant's wealth, to determine the appropriate level of punitive damages."  *Marshall v. Marshall (In re Marshall)*, 275 B.R. 5, 57-8 (C.D. Cal. 2002),

48

*vacated and remanded, In re Marshall*, 392 F.3d 1118 (9th Cir. 2004), reversed and remanded, *Marshall v. Marshall*, ___ U.S. ___, 126 S. Ct. 1735, 164 L. Ed.2d 480 (2006) (only because the Court recognizes that the amount of punitive damages must have a rational nexus to the actual damage award does the Court limit the total award to a doubling of the actual damages).

This amount is also based up the Court's determination that the debtors have seriously understated (and thereby concealed) substantial income listed in their bankruptcy schedules by failing to fully disclose the extent of income derived from Mrs. Freeland's ownership of the nursing care facilities. It is the opinion of this Court that her assets can well support the imposition of punitive damages in the amount imposed. The testimony of the defendants at trial indicated that they are now operating the facility at two locations, namely, at their private residence at 109 Norman Avenue, Glen Burnie, Maryland, and another one in Glen Burnie at 7808 Baltimore Annapolis Boulevard. Perhaps the award of punitive damages may help to discourage Mrs. Freeland from perpetrating similar fraudulent conduct against other elderly patients in her charge.

ORDER ACCORDINGLY.

49

cc:    Wayne S. Goddard, Esquire
        Cuomo & Goddard, LLP
        1018 Dulaney Valley Road
        Towson, Maryland   21204

        Wilbert H. Freeland, Sr.
        Christine E. Freeland
        109 Norman Avenue
        Glen Burnie, Maryland   21060

        Angel's Paradise
        7808 Baltimore Annapolis Blvd
        Glen Burnie, Maryland  21060
        (410) 761-5660

        Zvi Guttman, Trustee
        P.O. Box 32308
        Baltimore, Maryland   21282-2308

        Office of the U.S. Trustee
        2625 U.S. Courthouse
        101 West Lombard Street
        Baltimore, Maryland   21201